# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

M.R. and L.H., *minors, individually, by and through their parent*, DARNISHA GARBADE,

                    Plaintiffs,

v.

BURLINGTON AREA SCHOOL DISTRICT and SCOTT SCHIMMEL,

                    Defendants.

Case No. 21-CV-1284-JPS

# ORDER

## 1.    INTRODUCTION

On November 5, 2021, Plaintiffs M.R. and L.H., minors, individually, by and through their parent, Darnisha Garbade ("Garbade" and collectively, "Plaintiffs"), filed a complaint alleging violations of 42 U.S.C. § 2000d *et. seq.* and the Fourteenth Amendment. ECF No. 1 at 4. On March 17, 2023, Defendants Burlington Area School District ("BASD") and Scott Schimmel ("Schimmel") (collectively, "Defendants") filed a proposed renewed motion for summary judgment. ECF No. 122.[1]

For the reasons discussed herein, the Court will grant in part and deny in part the motion.

---

[1] Defendants previously moved for summary judgment. ECF No. 71. The Court denied that motion because the parties had not successfully met and conferred to file a statement of undisputed facts. ECF No. 115 at 6. The Court ordered that, should either party wish to file a renewed motion for summary judgment, it would have to move for leave to do so. *Id.* at 7.

## 2.    FACTUAL BACKGROUND[2]

### 2.1    Appropriate Facts for Consideration

Before the Court relays the facts, it must first address a procedural dispute raised by the parties during depositions and recorded in their agreed upon statement of facts. *See generally* ECF No. 123. Indeed, that filing is riddled with over 50 footnotes identifying where and how the dispute applies.

Specifically, the parties dispute whether the Court may consider an undisputed fact which is supported only by inadmissible evidence. *See, e.g.*, ECF No. 123 at 7, nn.2–3. The parties particularly contest the admissibility of evidence supporting many of their undisputed facts on grounds of hearsay and lack of foundation. Plaintiffs assert that such facts may be considered on summary judgment because they "could later be presented in an admissible form." *Id.* at 7, n.3 (quoting *Perez v. Reitz*, No. 3:20-CV-946 DRL-MGG, 2022 U.S. Dist. LEXIS 177250, at *4–5 (N.D. Ind. Sept. 29, 2022)).

---

[2]The following facts are drawn solely from the parties' statement of undisputed facts, with internal citations omitted for brevity and with other non-substantive edits. ECF No. 123. Where the parties' statement of undisputed facts is referenced in this Order, the Court similarly omits citations.

The Court has, however, omitted some of the facts entirely. For example, the parties include several paragraphs describing BASD administrators' lack of knowledge of Title VI. As far as the Court is concerned, it is immaterial whether the administrators could recite Title VI word-for-word or whether they had never heard of it. The critical issue is whether BASD was actually aware of incidents of pervasive racial peer-to-peer harassment and whether it was deliberately indifferent thereto. *See S.Q. v. Kettle Moraine Sch. Dist.*, No. 20-CV-1585, 2022 U.S. Dist. LEXIS 111167, at *16–17 (E.D. Wis. June 23, 2022) ("The fact that [the school district] did not address these incidents under its anti-harassment policies, but instead handled them as general student disciplinary matters, does not support an inference of deliberate indifference or discriminatory intent.").

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 2 of 65   Document 148

Critically, however, Plaintiffs fail to explain in what admissible form these facts could later be presented.

At this juncture, the Court will not consider those facts which are properly objected to as being supported solely by inadmissible evidence. "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Nor is inadmissible evidence sufficient to overcome summary judgment. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). It is not sufficient to merely assert that a fact may later be presented in an admissible form of some undisclosed kind. Instead, the burden is on the proponent of the fact and its supporting evidence to "explain the admissible form that is anticipated." Fed. R. Civ. P. 56, Committee Notes on Rules—2010 Amendment. Plaintiffs have not done so. Accordingly, the Court will disregard such facts.

## 2.2    Introductory Facts

Garbade is the mother of M.R. and L.H., who are African American girls. M.R. and L.H. first enrolled in school in BASD at ages seven and eleven, respectively. Garbade removed M.R. and L.H. from BASD in summer 2020, when they were twelve (seventh grade) and sixteen (tenth grade), respectively. BASD includes Winkler Elementary School ("Winkler"), Dyer Intermediate ("Dyer"), Karcher Middle School ("Karcher"), and Burlington High School ("BHS"). Connie Zinnen ("Zinnen"), a Caucasian woman, was the District Compliance Officer for BASD during the relevant period.

### 2.3 M.R.'s Experience at Winkler

M.R. began her attendance in BASD at Winkler for fourth grade during the 2017–2018 school year. During that time, Jacqueline Syens ("Syens"), a Caucasian woman, was Winkler's principal.

In October 2017, M.R. brought an orange, black, and clear plastic airsoft toy gun to school. She kept it in her backpack for most of the day but removed it at recess and on the bus after school to show people. The bus driver took the airsoft toy gun away from M.R., and an employee of the bus company spoke to Syens about the incident the following day. That bus employee erroneously informed Syens that M.R. had a BB gun on the bus. The school secretary also informed Syens that parents on Facebook were concerned about a student having a BB gun on the bus.

Syens believed she needed to address the parents' concerns. On October 5, 2017, Syens sent the following email to staff and parents:

> Last evening, I was contacted by Thomas Bus Service stating that a Winkler student had an unloaded BB gun on the bus. The bus driver retrieved the gun immediately. Please know that no children were in any danger at any time and disciplinary actions have been taken.
>
> This is a good opportunity for you to take time to discuss with your child the importance of safe reporting and unsafe behavior.

Syens sent this email without having taken any additional steps to corroborate what she had been told—specifically, that M.R. had a BB gun— because she believed what the bus employee told her and did not think the bus employee would make something up.

Following Syens' email, M.R.'s reputation at Winkler was ruined. Students and parents came to know that it was M.R. who was involved, and

students stopped talking to M.R. at school. M.R. also had to receive counseling after the incident.

The day after the airsoft toy gun was removed on the school bus, Syens called M.R. into her office and interrogated her about whether she was going to shoot up the school. M.R. insisted that she wasn't and believed that Syens was trying to coerce her to say that she was. This upset M.R., who believed that if she were not Black, Syens would not have interrogated her that way. Although M.R. referred to the airsoft toy gun as a "toy gun" during this conversation, Syens referred to it as a BB gun, and M.R. did not recall correcting her. Syens kept M.R. in her office the entire school day.

M.R. admitted to Syens that she brought the toy gun to school and had it out during recess and on the bus. Syens learned from a student that M.R. had the gun out at recess and was pretending to shoot at a student. The three total students that Syens spoke to about the incident told her that they were not frightened by it.

Syens told M.R. a story about a "black boy who was shot and killed by the police for having a toy gun, and they mistaken [sic] it for a real gun." As a result of their conversation, Syens realized that M.R. had no intention of harming anyone. M.R. was asked to remain in Syens' office while Syens left to call Garbade. Syens told Garbade that M.R. had brought a BB gun to school and that Garbade needed to pick M.R. up right away. When Garbade arrived to pick M.R. up, M.R. was shaking and had been crying.

Later, at a meeting between Garbade and Superintendent Peter Smet ("Smet"), Smet realized the gun was just an airsoft toy gun. Garbade told Smet that Syens' reaction to the situation was racist. According to Garbade, Smet apologized to her "for the bigotry." Garbade requested a public apology from Smet, a retraction of the email misidentifying the airsoft toy

gun as a BB gun, and a follow-up email clarifying the situation. Smet agreed to set up a meeting with Garbade and Syens.

Garbade later met with Syens and Smet. Syens refused to apologize to M.R. and said she stood by her actions. Smet ultimately apologized on Syens' behalf during the meeting. During the meeting, Syens acknowledged that she had told M.R. about a Black child with a toy gun who was killed by police. Syens conceded that she would not have told the same story to a white student. Although she refused to apologize, Syens sent out a clarification email after learning that it was a toy airsoft gun.

> This is a follow-up to the email sent to families on Thursday, October 5 about an imitation gun being retrieved by a bus driver. It has been verified that it was a toy airsoft gun (not a BB gun as stated in my previous email). Once again, I want to assure you that no one was in danger at any time.

> We'd like to remind families of the District Policy (443.6) that states, "No student regardless of age shall possess or use a weapon, imitation weapon or Oleoresin of Capsicum Spray (pepper spray) in school buildings, on school premises, in a district owned or controlled vehicle, school buses, or at any school sponsored function of event."[3]

> Especially with Halloween at the end of the month, I want to remind students and families to never bring any toy weapons: guns, swords, knives etc. to school.
> . . .

---

[3]The policy further states that "[a]n imitation weapon is defined as toy guns, water guns, non-working replicas of weapons, cap guns, poppers, war souvenirs, or any other object which could reasonably be mistaken for an actual weapon regardless of whether it is manufactured for that purpose." ECF No. 123 at 13. "Students found in violation of other areas of this policy shall be subject to school disciplinary action up to and including parental notification, police notification, suspension and recommendation for expulsion." *Id*.

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 6 of 65   Document 148

M.R. was suspended for one day for bringing the airsoft toy gun to school. Syens asserted this was because M.R.'s actions violated the school's policy of not bringing weapons or toy weapons to school.

Comparatively, there had been an incident prior to the 2017–2018 school year in which a student realized he had left a knife in his backpack from Boy Scouts. When he realized this in the morning, the teacher took him to the office, and staff held on to the knife. According to Syens, no similar email was sent to parents about the incident because the boy realized he had the knife before school had started, he did not take it out to show other students, and he immediately notified his teacher. The student was not disciplined, but his parents and the then-superintendent of BASD were informed.

There were additional incidents in other BASD schools during the 2017–2018 school year in which students brought weapons to school and were disciplined. In 2017, a student at another elementary school in BASD was suspended after bringing a knife to school. In 2018, a student at a different BASD elementary school received a detention for the same conduct. Also in 2018, a student at Dyer was suspended, referred to police, and had his bussing route changed after bringing a hunting knife to school. And a BHS student in 2018 received two days' suspension after a hunting rifle was found in his car.

In 2019, two Dyer students received discipline for having knives at school—one was suspended for a half-day for having plastic knives in his pocket, and the other received suspension and detention. Additionally in 2019, a Karcher student was suspended for three days after threatening a student and then showing up at school the next day with a knife.

### 2.4 M.R.'s Experience at Dyer

#### 2.4.1 2018–2019 School Year

For the 2018–2019 and 2019–2020 school years, M.R. attended Dyer. From 2015 to mid-2022, Schimmel, a Caucasian man, was the principal at Dyer. Schimmel's responsibilities included handling all complaints of student-on-student harassment. If a harassment incident involved race discrimination, Schimmel would typically involve Zinnen. To Schimmel's knowledge, however, no training was administered to Dyer's teachers and staff to identify peer conflicts that were specifically racial in nature.

In September 2018, a white student dug her nails into M.R.'s arm, leaving marks on M.R.'s skin. M.R. and this student had been generally friendly prior to this incident. M.R. did not know why the student did this. M.R. reported the incident to the recess aid, who responded, "Okay." No one at Dyer contacted Garbade or sent M.R. to the nurse.

M.R. told Garbade what happened when she got off the bus that day. Garbade emailed the school about the incident, characterizing it as "bullying and racism." Garbade reported that M.R. told her the student dug her nails into M.R.'s arm because the student "didn't want [M.R.] to sit at the same table" as her for lunch. Garbade's email was forwarded to Schimmel. Schimmel spoke with the offending student.

The following month, a white student on the bus told M.R. he would come to her house and shoot her because "his dad has access to guns because he was a police officer." M.R. claimed she did not know why the student told her this and that they had not spoken before. But M.R. vaguely recalled having told the student to "shut up" prior to him making this statement. In response, M.R. told the student that her brother would kill the student before the student got a chance to do it to her. M.R. reported the

statement to the bus driver, who told her to return to her seat, which was very near to the offending student. M.R. reported the statement to Garbade.

The following day, Schimmel was made aware of this incident. Schimmel learned from witnesses on the bus that the student made this statement to M.R. after M.R. told him to shut up and that she didn't want to hear his voice anymore. Schimmel also learned that M.R. had been told to stay seated near that student despite having told the bus driver that she wanted to sit elsewhere because of the student's comments.

The student was disciplined. M.R. received no discipline. Schimmel searched the student's locker, coat, and backpack and ultimately concluded the threat was not a serious one warranting police involvement. The student received one day of in-school suspension and his parents were contacted. Garbade disagreed, asserting that the school "did not do anything" upon being made aware of the incident.[4] Garbade emailed Schimmel and Smet to follow up on this, and other, incidents.

In December 2018, a student pushed M.R. down the stairs at school. M.R. did not report this incident to anyone at school, but she told Garbade. Garbade reported the incident to the school several months later in a February 5, 2019 email. Schimmel was made aware of the incident, but M.R. was unable to identify who pushed her. Schimmel viewed the surveillance footage but couldn't see what happened, and he was not able to obtain any additional information from witnesses.

---

[4] Plaintiffs' "statement of additional and disputed facts on summary judgment" states that "Schimmel did not share with [] Garbade that he had done anything to discipline [the offending student] for his murder threat" and that the first time Garbade heard about any discipline having been issued was during Schimmel's deposition. ECF No. 137 at 1. This is immaterial.

"Sometime before January 14, 2019," a student told M.R. something to the effect of, "[w]hen the lights are off you can't see black people." Then this student threw a hair clip at M.R.'s head while they were on the bus. M.R. does not know why this student did this. When M.R. got home, she showed Garbade a mark on her face from the clip and told Garbade that a student had thrown something and hit her in the face. Garbade called Schimmel to inform him that M.R. had been injured by a student on the bus and that M.R. was not being kept safe. Garbade sent a photo of the mark on M.R.'s face and demanded that something be done.

In response, Schimmel spoke with the bus company and the aggressor student's parents, and he assigned the student to after school detention. Schimmel informed Garbade of these consequences. Schimmel also told Garbade to tell M.R. to report if the student made any additional comments. Schimmel did not speak personally to M.R. about the incident.

"[S]ometime before February 5, 2019," M.R. told Garbade that a girl kept mooning her and other students in class. M.R. recalled little of this incident, and she didn't recall reporting it to anyone at school. Garbade reported it to Schimmel by email on February 5, 2019. Schimmel had ongoing discussions with the offending student and her special education teacher to address the issue but did not respond to Garbade's email.

In "January or February" 2019, a student reportedly tried to spit on M.R. on the playground. According to M.R., she had no notable prior interaction with this student. She had no idea why the student did this. M.R. told Garbade about the incident, but she does not recall telling anyone else.

Then, on February 4, 2019, this same student "walked up to M.R. and the girls she was with, stopped, bent over, and had something (like vomit) coming out of his mouth." Then, the student punched M.R. in the mouth.

M.R. tried to hit him back, but her friends held her back. The student didn't say anything to M.R., and M.R. does not know why he vomited or punched her. M.R. reported the incident to the teacher's aide, but nothing was done. After recess, M.R. reported the incident to Schimmel. While sitting in Schimmel's office, M.R.'s "tooth was bleeding." She grabbed a tissue and held it to her bloody tooth. No one offered M.R. medical attention or asked if she was alright. M.R. did not ask to see the nurse.

Schimmel told M.R. he suspected she was more involved than she was telling him. Schimmel told M.R. it was good that her friends had held her back from hitting the student back, because she "might have gotten a ticket." This made M.R. feel like she was no longer a victim, but rather guilty of committing a crime. It upset her that Schimmel was questioning her "for doing nothing." No one from the school contacted Garbade. M.R., crying, informed Garbade of what happened when she got home.

Garbade reported the spitting and vomiting/punching incidents to Schimmel and Smet in a February 17, 2019 email. Schimmel told Garbade that the student was not trying to spit on M.R., but was trying to spit on the ground. Garbade told Schimmel and Smet that the violence against her child needed to stop and that M.R. had been hit and bullied too many times.

Schimmel investigated the spitting and vomiting/punching incidents. He spoke with the alleged aggressor student, with M.R., and with witnesses, and he reviewed surveillance footage. Schimmel told Garbade that the student was flailing his arms rather than trying to hit M.R. and that he had been trying to spit on the ground. Garbade felt that Schimmel discounted M.R.'s perspective and unfairly suspected her of being more involved. Garbade believed Schimmel was suspicious of M.R. since it was M.R. who was "detained and interrogated" and "threatened to be

disciplined." But the offending student was, indeed, disciplined. He received four days of detention and one day of suspension. Garbade informed Schimmel that "considering the numbers and types of incidents" that continued to occur, Schimmel's handling of the incidents didn't "seem effective."

In February 2019, the same student who had told M.R. he was going to shoot her called her an "asswipe" on the bus. M.R. did not remember what prompted this statement. Nor did she remember reporting the statement to anyone besides Garbade. Garbade reported the statement to the school by email. And at the end of February 2019, Garbade emailed Schimmel and Smet that M.R. told her a student hit her on the butt the day prior. She followed up on that email several weeks later after receiving no response, writing that "when [M.R.] stole snacks, Principal Schimmel called her and [M.R.] was given consequences at school, at home, and she met with Officer Borchardt, which was Schimmel's idea."

Several months later, Garbade emailed Schimmel and reported that M.R. told her that the student told M.R. something to the effect of, "people who are snitches turn into bitches." Garbade also told Schimmel that another student asked M.R. why she tattled. M.R. believes students retaliated against her for tattling but that the student told her "bitches get stitches" because of her race.

Following these incidents, Garbade kept M.R. out of school. M.R. told Garbade she was scared to go back to school. M.R. no longer felt safe riding the bus. She missed two days of school and stayed off the bus for two or three days.

Towards the end of April 2019, Garbade and M.R. reported to the school resource officer that a student on the bus called M.R. a "black girl"

and told her that "[s]nitches are bitches." They also reported that another student asked M.R. why she tattled, and another student gave M.R. a sticky note with a middle finger on it. M.R. said she gave the sticky note to the bus driver, who threw it away. Garbade called Schimmel and the bus company and requested that the note be removed from the trash and that the issue be addressed. Garbade also emailed Schimmel that she would involve the Burlington Police Department in light of the "ongoing racial harassment."

Schimmel responded to Garbade's email, telling her that he would contact the bus company for surveillance video. Schimmel also told Garbade he had touched base with the school resource officer, who recommended implementing a cease-and-desist contract to keep these students from bothering M.R. The student who called M.R. an "asswipe" and threatened to shoot her was removed from M.R.'s bus.

Later that month, Garbade reported to Schimmel that M.R. continued to be teased on the bus by additional students for tattling and that the students were being mean to M.R. and making fun of her hair. M.R. reported that after a student told her she didn't like M.R.'s bun, M.R. responded, "I don't like your face" and "how about I smash your face in?" Schimmel spoke with Garbade about the incident over the phone. The school resource officer was additionally made aware of the situation.

Also in April 2019, M.R. claims that a student made a negative comment about her race and skin. She reported the comment only to Garbade, who reported it to Schimmel. Schimmel responded to Garbade's email and asked her to ask M.R. where the comment occurred and what students were involved. Garbade informed Schimmel of the student that allegedly made the comment, and Garbade also reported that another incident had occurred on the school bus in which that same student called

M.R. a "Black girl," told her to "suck it," and wrote "F-You" on a sticky note, which M.R. gave to the bus driver.

The school enforced a cease-and-desist contract to keep this student away from M.R. Garbade emailed Schimmel on May 21, 2019, however, to report that the student violated the cease-and-desist contract by riding the bus when he was not supposed to. As a result of this and another unrelated incident, the student served three lunch/recess detentions.

Schimmel also learned in April 2019 that another student asked M.R. in Spanish if she "had a black boyfriend." Schimmel communicated with Garbade about this, and the student was issued a cease-and-desist contract.

The same month, there was another allegation that a student called M.R. a "little black girl" on two occasions, but M.R. does not recall that incident. Additionally, M.R. recalled that another student bullied her on the bus and called her and other students, including a white student, the "B-word." A member of BASD staff also reported that an unknown student on M.R.'s bus was loudly yelling and swearing, singing a song about tying a noose, and talking about school shootings. The staff member reported this conduct to Schimmel, and Schimmel informed Garbade of the conduct. M.R. did not specifically remember this incident.

At one point, there was also an issue surrounding whether Schimmel assigned M.R. a specific seat on the bus. When Garbade emailed Schimmel to inquire about this, Schimmel told her he moved other students away from M.R. who were bothering her. Schimmel also called the bus company, and he then told Garbade that the bus driver had students who get off early in the route, such as M.R., sit towards the front of the bus to make it easier for students to get off. But when Garbade met with Schimmel in person,

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 14 of 65   Document 148

Schimmel admitted to personally assigning M.R. the seat. Garbade felt like Schimmel's story changed several times.

Eventually, after discussions with Schimmel, Smet, and Garbade, the school implemented a daily check-in system for M.R. These check-ins occurred starting on April 1, 2019 and ended on the last day of school in June of 2019. Through this system, M.R. checked in at the end of each day and in the morning. The purpose of the check in was for M.R. to report if any bullying or incidents had occurred. If an issue came up, it was entered into a daily check-in log. Some of the incidents described herein as having occurred during this period do not appear in that daily check-in log. Garbade did not feel like the daily check-in system was effective.

### 2.4.2    2019–2020 School Year

At the beginning of the new school year, M.R. reported that two students, one of whom did not attend Dyer, called her an "asswipe" on the bus. M.R. believed the word "asswipe" was racist. Garbade emailed Schimmel and several other BASD staff and administrators about the incident. Then-superintendent Stephen Plank ("Plank") informed Garbade that the bus surveillance footage would be reviewed.

Schimmel spoke with M.R. to obtain additional context. M.R. conceded to having called one of the students "dummy," to which the students responded by calling her "asswipe." Schimmel also spoke with the Dyer student who called M.R. "asswipe" and confirmed the allegations. The Dyer student was assigned a seat on the bus for over three weeks as discipline. Schimmel also communicated with the principal of the student who attended a different school to report that the student was using inappropriate language. That principal later informed Schimmel that the student received consequences for his behavior. M.R. received no discipline

for her own language apart from a discussion about the issue and "some redirection." Schimmel informed Garbade what action had been taken.

In October 2019, M.R. received a bus ticket for sitting sideways on the bus. M.R. initially told Garbade that she received a ticket for standing on the bus. Garbade contacted Schimmel to clarify the situation.

M.R. testified that "everybody sat sideways on the bus" and she didn't think "anybody else got a ticket." Schimmel spoke with M.R. and the bus company. The bus company confirmed M.R. had been sitting sideways after the students had been reminded not to do so. M.R. admitted to Schimmel that she had, indeed, been sitting sideways, and her feet may possibly have been obstructing the aisle. Schimmel assigned no further discipline to M.R. and instead reminded her of bus expectations.

Garbade asked Schimmel to reinvestigate the situation "from the perspective of unconscious bias" because she believed if he reviewed the bus footage again, he would see there were white students sitting sideways who did not receive a bus ticket. It does not appear that any such reinvestigation took place, although Schimmel emailed Garbade to tell her about his conversations with M.R. and with the bus company.

In January 2020, a white student with whom M.R. thought she was friends pushed M.R. down the stairs at school. The student did not say anything to M.R. during this incident, and M.R. does not know why it happened. Schimmel spoke with M.R. and reviewed the surveillance footage, and he concluded that he did not think M.R. had been pushed. He informed Garbade of this conclusion. Garbade disagreed. Schimmel spoke with additional students and ultimately determined that the student had, indeed, pushed M.R. down the stairs. According to Garbade, only after the aggressor student admitted to having done so did Schimmel believe M.R.'s

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 16 of 65   Document 148

version of the events. The student received detention as discipline. M.R. missed no school because of the incident, but Garbade did bring her to the emergency room and called the police to press charges.

At one point during the 2019–2020 school year, M.R. reportedly received a detention for behavior in the cafeteria, although she did not recall the details. Schimmel ultimately withdrew the detention, spoke with M.R. about the incident, and informed Garbade.[5]

M.R. also reported having been called the "N-word" on multiple occasions, but she could not recall if any adults were around to hear this, and she did not report it to anyone.

M.R. suspected that Schimmel treated her differently because of her race but conceded that she felt this way not due to "facts, but it's just like a way [she] think[s] about it." She did not recall Schimmel making any comments to her about her race or skin color.

M.R. left BASD prior to beginning her seventh-grade year, which was the 2020–2021 school year. She attended therapy on and off between July 2017 and May 2021. She was diagnosed at one point with "an adjustment disorder with mixed anxiety and depressed mood." M.R. reported in therapy to having "some difficulties at school." Therapy notes from May 2021 noted that she had anxiety due to being a victim of racism in Burlington and Kenosha, Wisconsin.

### 2.5    L.H.'s Experience at Dyer

L.H. began her attendance in BASD at Dyer for sixth grade during the 2016–2017 school year. One day that school year, L.H. wore her hair in

_____

[5]Plaintiffs' "statement of additional and disputed facts on summary judgment" asserts that M.R. received the detention allegedly for "being too loud" even though "all the students in the cafeteria were loud." ECF No. 137 at 1.

an afro. She heard a student say that her hair reminded him of a "black version of Albert Einstein." L.H. reported the comment only to Garbade, but Garbade did not recall if she reported it to anyone at BASD. L.H. didn't know if any BASD employees heard the comment.

After L.H. and another Black student scored the highest jump in gym class during either L.H.'s seventh or eighth grade year, that same student said, "of course it was the only two black kids who got the highest score." L.H. did not tell the gym teacher and did not know whether the teacher heard the comment. L.H. reported the comment to Garbade, but Garbade did not recall if she reported it to anyone at BASD.

Another student at one point told L.H. she was "illiterate because [she's] black." L.H. did not report this to anyone at BASD, but she informed Garbade. Garbade reported the incident to Attorney Saveon Grennell ("Grennell") as part of an investigation into a March 26, 2020 formal racial discrimination complaint that Garbade had filed with BASD.

L.H. also experienced an incident related to riding the bus for Girl Scouts. A few days prior to a Girl Scouts meeting, Garbade called the school office to confirm that L.H. would be riding a different bus that day. The school office employee told Garbade she would need to provide a handwritten note, and so Garbade provided one to L.H.

L.H. got on the bus but did not give the note to the driver because she thought she needed to provide it at the end of the ride. Two friends of L.H. who were also going to the meeting did not have any notes, but the driver let them off the bus without issue.[6] As L.H. tried to exit the bus, the

_____

[6] The parties' statement of undisputed facts does not provide the race of these students. Plaintiffs' "statement of additional and disputed facts on summary

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 18 of 65   Document 148

driver asked for her note. She provided it, but the driver said the note "wasn't good enough" and told L.H. she couldn't get off. L.H. asked why the driver "only stopped her and not the other girls who were riding the bus without a note." The driver accused L.H. of being disrespectful.

After this incident, Schimmel called L.H. to his office because the bus driver had complained about her being disrespectful. L.H. believed the bus driver treated her differently because she is Black. L.H. tried to tell Schimmel that two of her friends were allowed off the bus without notes, but Schimmel told L.H. that they "were not talking about her friends." L.H. told Garbade about the bus note incident, but Garbade does not recall whether she discussed the issue with anyone from BASD thereafter.

L.H. also recalled several students using the "n-word" on the bus freely during her sixth-grade year at Dyer. One student, specifically, would use the "n-word" frequently in conversation and would call other people that word, but did not call L.H. that word. L.H. never told anyone at BASD about this language, but she told Garbade. L.H. also told one of the students directly to stop using the "n-word," but he did not.

### 2.6    L.H.'s Experience at Karcher

L.H. attended seventh and eighth grade, or the school years of 2017–2018 and 2018–2019, at Karcher.

#### 2.6.1   2017–2018 School Year

A student on L.H.'s bus told L.H.'s friend that L.H. was "pretty for a black girl." L.H. did not report this to anyone from BASD, and she did not report it to Garbade until late 2022. Garbade does not recall whether she

---

judgment" asserts that L.H. was the "only Black child in the Girl Scout incident—the other girls were Caucasian." ECF No. 137 at 2.

ever told anyone at BASD about this comment. L.H. also testified that she recalled this student making generally discriminatory and racist comments towards her, but she could not remember specifically what they were or when they occurred.

#### 2.6.2 2018–2019 School Year

During L.H.'s eighth-grade social studies class, a student asked L.H., the "only Black person in the room," why "Black people liked chicken." L.H. told the student that "not all Black people do like chicken" and asked him "why he would say that." L.H. did not report the comment to anyone at BASD, but she did report it to Garbade. Garbade did not recall reporting it to BASD. The teacher was not in the room when the comment was made, but there "may have been an aide in the room."

On another occasion during her social studies class, a student said something to the effect of, "It doesn't really seem like black people's hair grows that much." L.H. did not report this comment to anyone at BASD. She reported it to Garbade eventually, but Garbade did not report it to BASD until March 2020.

L.H. also recalls a student telling L.H. during a color run event that L.H. was "doing, like, white face." L.H. did not report this comment to anyone at BASD.

In March 2019, Garbade asked Schimmel and Smet where she could find "BASD's policy regarding racial harassment," but no one responded to her request, and neither Schimmel nor Smet ever gave her the policy.

### 2.7 L.H's Experience at BHS

L.H. attended BHS for ninth grade during the 2019–2020 school year. At lunch one day, she told her friends she liked a boy. A student then asked L.H. if she would leave the table. That student then told the rest of the group

that L.H. should "not like the boy she liked" because it was "not good to mix races while dating."

L.H. reported this to Principal Ryan Heft ("Heft"). Heft apologized and told L.H. he would speak with the student, come up with a solution, and report back. Heft ultimately investigated the incident, spoke to witnesses, and discussed the incident with BHS's psychologist.

A school counselor reported that the offending student was brought to her office. The school counselor was informed that L.H. and other students were accusing the student of being racist. The student was spoken to about her comment, and BHS staff ultimately concluded the student had not intended to be racist. According to BHS staff, the student wrote an apology letter and apologized for her comment. As additional discipline, the student was instructed to spend her lunch in a staff office for the following three school days. She was also told that she would be reassigned to a different lunch table for the following week.

Heft called Garbade the same day of the incident. In this conversation, he recommended segregating the offending student from other students of color, but Garbade told him this was not a good idea. Heft then asked Garbade what she thought he should do, and she told him that the student should be taught that their behavior was racist, that this behavior was not tolerated at school, and that there would be consequences if it continued. Heft later communicated with L.H. and told her something to the effect of, "she won't be bothering you anymore" and that the student wouldn't be allowed to sit with L.H. anymore. L.H. didn't think it was a good idea to segregate the student from the students of color.

Notwithstanding Heft's instruction, the student continued to sit with L.H, and L.H. did not report this to Heft. However, Heft was on lunch duty and L.H. assumed he could see them sitting together.

On another occasion during math class, L.H. heard from another student that the boy she liked would not be able to date her because "his parents did not want him to date [L.H.] because she was black." L.H. did not report this to anyone at BASD, but she did inform Garbade. Garbade did not report this to BASD until March 2020 as part of her formal racial discrimination complaint.

L.H. also testified that her sibling told her that a student made racist comments, including something to the effect of, "people are like jellybeans, no one likes the black ones," in class.[7] She reported this to Garbade, who reported it to Plank and then-principal Eric Burling ("Burling") in September 2019. L.H. also testified that the student that allegedly made this comment was an "openly known racist at BASD."

At L.H.'s homecoming dance, students loudly sang the "n-word" during multiple songs, although it had been removed from the songs that were playing. Multiple BHS staff members, including Burling, were present as chaperones at the dance. L.H. did not go up to any of them to complain about the use of the "n-word," but L.H. believed they could hear the use of the "n-word." Additionally, Garbade believes she reported this incident to

---

[7]Defendants object to consideration of this evidence on grounds of hearsay. ECF No. 123 at 55 n.48. It is possible, however, that this evidence could be offered not for the truth of the matter asserted, but rather to show awareness of this alleged incident on the part of BASD. Whether a student actually said that "people are like jellybeans, no one likes the black ones" is not necessarily material—what is material is that that allegation was reported to BASD and that BASD failed to investigate or otherwise respond to it.

someone as part of her formal racial discrimination complaint in March 2020.

During gym class one day, L.H. also remembers a boy telling her, "You're just some stupid black girl." L.H. did not report the comment to anyone at BHS or BASD, but she told Garbade. Garbade does not recall whether she told anyone at BASD about this incident.

On another occasion in social studies class, a student said, "Black people are good at sports and all, but they don't work as hard as white people do." L.H. did not report this comment to anyone, but she testified that the teacher was "right behind" her when this comment was made. She looked at the teacher to see if he was going to say anything, but he did not. In any event, Garbade eventually reported the incident as part of her March 2020 formal racial discrimination complaint.

Around September 5, 2019, a student called L.H. the "n-word" while on the bus. The student had used this word multiple times before, but this occasion was the first time he called L.H. the "n-word" directly. L.H. did not report the language to anyone at BASD, and she missed no school due to this incident specifically.[8] She did report the comment to Garbade, who reported it to BASD on September 12, 2019. And L.H. additionally testified that she at one point had a conversation with Heft in which she told him, "[t]here are so many kids who use the N-word." In response, Heft said something to the effect of, "yeah, I know. It's disgusting."

---

[8] Plaintiff's "statement of additional and disputed facts on summary judgment" asserts that M.R. and L.H. have "always loved school despite the racism they endured" and that "is why they missed so few days." ECF No. 137 at 2.

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 23 of 65   Document 148

L.H. also recalls an incident in which a white student told L.H. that she was a "smart black girl," but L.H. could not recall when exactly this occurred. L.H. didn't report it to anyone at BHS or BASD, but she did tell Garbade, who reported the comment in a March 2, 2020 email. However, the staff member to whom Garbade sent this email did not forward it to any BASD administrator or take any investigatory action. The staff member did, however, "talk[] to or email[] with one of the counselors, who had checked into it," and the counselor told her that they were "going to start diversity groups at the schools." Garbade additionally reported this comment in her March 2020 formal racial discrimination complaint.

At BHS, L.H. missed just one day of school because of these incidents. She did not recall missing any assignments. Her GPA dropped, and she attributes this to "racism" and "just normal stress being in high school." Following her time at BHS, L.H. started therapy and was diagnosed with, and sought treatment for, PTSD and persistent depressive disorder. One of her goals in therapy was to "address the trauma."

### 2.8 Non-M.R. or L.H. Incidents

BASD had actual notice of at least 33 instances of racialized conduct at Dyer and BHS from January 5, 2016 to February 14 2020 not involving Plaintiffs. In each of those 33, the offending students received discipline of some form. Discipline implemented included in-school suspension, lunch/recess detention, notification to parents, after-school detention, and out-of-school suspension.

### 2.9 Garbade's Formal Complaint; Subsequent Investigation

Garbade filed a formal racial discrimination complaint with BASD in March 2020. Therein, she wrote:

My children have been called [N-word] on multiple occasions, told that they can't be seen when the lights are off because they're black, told that people are like jelly beans, no one likes the black ones, called black girl, called they're smart to be black, detained in the principals [sic] office long periods of time (interrogated) when they were harmed by other white students. Told by the principal about a black kid in Milwaukee who was shot and killed by police. Pushed down the stars [sic]. Spit on & had a tooth knocked out.

BASD's legal counsel commenced an investigation. It did not, however, investigate Garbade's allegations of harassment at BHS, writing that the "allegations related to the high school were not the subject of the Complaint and therefore not within the scope of [the] investigation."

The investigation concluded that there had been no violation of BASD's antiharassment and nondiscrimination policies and that there was "no evidence that the District's actions in its treatment of [M.R.], in response to concerns raised by Ms. Garbade regarding bullying, or regarding other incidents discussed below, were based on [M.R.'s] race or gender."

Garbade appealed this conclusion to the school board. In September 2020, the school board affirmed. Garbade appealed the school board's decision to the Department of Public Instruction ("DPI"). The DPI issued a decision in April 2021 concluding that "a racially hostile environment existed at the District," that the racial harassment was "severe, pervasive, and persistent," that BASD had "actual notice" of it, and that BASD "failed to appropriately respond" to it.

3.      SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). But "[s]imply denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (internal citation omitted).

4.     **LAW & ANALYSIS**

   **4.1    Title VI Peer to Peer Harassment / Hostile Environment Claim**

The Court first addresses Plaintiffs' Title VI peer-to-peer/hostile environment claim against BASD.[9] As this Court has noted, "its task, here, [i]s searching for some culpable action on behalf of the school that could reasonably support a discrimination claim." *N.K. v. St. Mary's Springs Acad. of Fond du Lac Wis., Inc.*, 965 F. Supp. 2d 1025, 1027 (E.D. Wis. Aug. 16, 2013). "However, the scope of the Court's inquiry is limited, as '[j]udges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues.'" *Id.* (internal citation omitted).

Title VI provides that "[no] person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[10] "[A] Title VI claim, although aimed at the discriminatory use of federal funds, is one that ultimately seeks to vindicate personal rights." *Monroe v. Columbia Coll. Chi.*, 990 F.3d 1098, 1100 (7th Cir. 2021). In the educational setting, specifically, "a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer

_____

[9]This claim is asserted solely against BASD. *See* ECF No. 1 at 4 ("This is a Civil Rights claim brought under 42 U.S.C. 2000d *et. seq.* seeking damages, fees, costs and attorney's fees against [BASD]."); *see also Tuggles v. City of Antioch,* No. C08-01914 JCS, 2009 U.S. Dist. LEXIS 92495, at *68 (N.D. Cal. Oct. 2, 2009) ("A Title VI claim cannot be asserted against an individual defendant because the individual is not the recipient of the federal funding.") (citation omitted).

[10]The parties here do not dispute BASD's receipt of federal funds.

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 27 of 65   Document 148

harassment of a student." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (internal citation omitted).

"Keeping in mind how thoughtless and even cruel children can be to one another, the Supreme Court has interpreted both Title VI and Title IX to impose a demanding standard for holding schools and school officials legally responsible for one student's mistreatment of another." *Doe v. Galster*, 768 F.3d 611, 613 (7th Cir. 2014);[11] *see also id.* at 617 ("The Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment."). "School officials are given broad latitude to resolve peer harassment and are liable only in 'certain circumstances.'" *Id.* (internal citation omitted).

"School officials must have had 'actual knowledge' of harassment 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Id.* at 613–14 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). "To have actual knowledge of an incident, school officials must have witnessed it or received a report of it." *Id.* at 614. And "[t]o impose liability, school officials' response to known harassment also must have been 'clearly unreasonable in light of the known circumstances.'" *Id.* (internal citation omitted). The Court views these requirements as "essentially three separate elements: (1) program acceptance of federal funding; (2) pervasive hostility to race or gender in the program; and (3) actual notice and deliberate indifference on behalf of the school district." *N.K.*, 965 F. Supp. 2d at 1033.

---

[11] "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Galster*, 768 F.3d at 617.

### 4.1.1 The Nature of the Alleged Incidents

As a threshold matter, Title VI protects students from discrimination only if it is based on race, color, or national origin. *Galster*, 768 F.3d at 617; *N.K.*, 965 F. Supp. 2d at 1033 ("The Seventh Circuit . . . has acknowledged that there is a threshold question in these cases of whether the alleged hostility was, in fact, based upon race or gender."). It is prudent, therefore, to "examine whether the harassers were actually motivated by personal animus, instead of one's protected class." *N.K.*, 965 F. Supp. 2d at 1033. This is an indisputably "very difficult determination to make," and it can be "an extremely slippery slope to attempt to divine whether the harassers' intentions were based upon race." *Id.* Nevertheless, the Court must address this question because Defendants assert that "most incidents were peer conflicts completely unrelated to race." ECF No. 125 at 1–2.

Some of the reported incidents are, even viewing them in the light most favorable to Plaintiffs, unaccompanied by any facts or evidence that would allow a reasonable juror to conclude that they were racial in nature. For example, there is no indication that M.R. and other students, including a white student, being called the "B-word" was racial in nature. Similarly, nothing suggests that the "mooning" incident was racial in nature. The occasions in which M.R. was bullied for tattling appear to have been motivated not by her race, but by the school's involvement in the allegations of bullying. And the record reveals nothing that would allow a reasonable juror to infer that the offending students were motivated by race when they allegedly dug their nails into M.R.'s arm,[12] threatened to shoot

_____

[12]Plaintiffs argue that a reasonable juror could find this incident to be based on race because the white offending student didn't want M.R. to sit at the same table as her. ECF No. 129 at 6. But that still leaves this Court, and the fact finder,

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 29 of 65   Document 148

her,[13] spit on her, vomited in front of her, punched her, pushed her down the stairs, or hit her on the butt.

These incidents are indisputably inappropriate and unacceptable, but there is simply nothing in the record that would allow either the Court or a reasonable juror to infer that the offending students were motivated specifically by race, rather than by "personal animus." *N.K.*, 965 F. Supp. 2d at 1033. Similarly, nothing in the record suggests that M.R.'s detention for her behavior in the cafeteria was racial in nature.[14]

---

to speculate as to why the student didn't want to sit with M.R., and "reliance on speculation is not enough to get the case to a jury." *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011). Plaintiffs are entitled to all reasonable inferences, but a reasonable inference cannot be based on mere speculation and conjecture. *See Valencia v. City of Springfield*, Nos. 16-3331 & 17-3278, 2020 U.S. Dist. LEXIS 44811, at *13 (C.D. Ill. Mar. 16, 2020) ("To create a genuine factual dispute, however, any such inference must be based on something more than 'speculation or conjecture.'") (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)); *Wieland v. DOT*, 98 F. Supp. 2d 1010, 1016 (N.D. Ind. 2000) (noting, in Title VII context, that the "Court must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. 'An inference is not a suspicion or a guess'") (citation omitted).

[13]Plaintiffs argue that this is an incident that a reasonable juror could deem racial in nature, but Plaintiffs do not actually explain how a reasonable juror could so infer. ECF No. 129 at 6. To the contrary, the record suggests that the student made this comment in response to M.R. telling him to shut up because she didn't want to hear his voice. M.R.'s own use of "derogatory language against other students . . . would have justified any tendency on [BASD's] behalf to treat this situation as one of 'kids being kids.'" *N.K.*, 965 F. Supp. 2d at 1035.

[14]And even if the Court were to conclude that these various incidents could reasonably be deemed racial in nature, it would not ultimately matter because the respective schools in which these incidents occurred reasonably addressed, in one form or another, almost all of these incidents.

When a student threatened to shoot M.R. on the bus, the student was assigned to a different bus; had his locker, coat, and backpack searched; was issued a cease-and-desist contract; and was suspended.

The record reveals plenty of situations, however, that are either clearly racial in nature or that a reasonable juror could deem racial in nature. For clarity, the Court will list those incidents here:

- When M.R. brought a toy gun to school, Syens informed her that a Black child had been shot and killed by police for having a toy gun, showing that the response to that situation was at least partially based in race.
- When M.R. was repeatedly called "asswipe," "black girl," and similar racially charged names.
- When a student told M.R. something to the effect of, "[w]hen the lights are off you can't see black people," and then threw a hair clip at her face.

---

When students teased M.R. for tattling and called her a "snitch," Schimmel and the school resource officer discussed "implementing cease and desist contracts" for the offending students, although it is not clear whether such cease-and-desist contracts were ultimately issued.

When a student reportedly tried to spit on M.R., vomited in front of her, and punched her, Schimmel reviewed the surveillance footage; discussed the incident with M.R., the offending student, and other witnesses; and imposed a four-day detention and a one-day suspension on the offending student.

When M.R. was pushed down the stairs, Schimmel reviewed the surveillance footage and attempted to obtain more information from witnesses. Neither he nor M.R. was able to identify the offending student, and so no discipline could be issued. That presents no actionable error because "[i]t is not appropriate for the court to second-guess an administrator's conclusion that he lacked evidence sufficient to discipline a student." *S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *12. And on another occasion when M.R. was pushed, Schimmel investigated the situation, spoke to M.R., viewed the surveillance footage, and imposed detention on the offending student.

In response to the mooning incident, Schimmel had "ongoing discussions with the student and her special education teacher to address that wardrobe issue."

It does not appear from the record that BASD took any specific disciplinary action in response to M.R.'s arm being scratched or M.R. being hit on the butt. BASD personnel did, however, meet on multiple occasions with Schimmel and Smet, after which a daily check-in system was implemented to regularly check in with M.R. about whether she was experiencing any additional incidents.

- When an unknown student sang a song about tying a noose on M.R.'s bus.

- When a student asked M.R. if she had a black boyfriend.

- When students made mean comments about M.R.'s hair.

- When M.R. got a bus ticket for sitting sideways on the bus even though other students on the bus, including white students, were also sitting sideways.

- When a student made a comment about L.H.'s afro.

- When a student made a comment about L.H. and another Black student scoring the highest jump.

- When a student told L.H. she was illiterate because she was Black.

- When a student commented on the rate of growth of "black people's hair."

- When a student used the "N-word" around and in reference to L.H.

- When L.H. was told she was pretty for a Black girl.

- When a student commented that all Black people like chicken.

- When a student told L.H. that she was doing "white face" at the color run.

- When a student made a comment about mixed-race dating.

- When a student commented that Black people were like black jellybeans.

- When a student told L.H. that Black people "don't work as hard as white people do."

- When students loudly and repeatedly sang the "N-word" at the school dance in front of L.H.

- When a student called L.H. a "stupid black girl."

- When a student told L.H. she was smart for a Black girl.

- When L.H. was disallowed from exiting the bus, notwithstanding her permission note, while two other

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 32 of 65   Document 148

students were allowed to exit the bus without a permission note.[15]

The Court has no difficulty concluding that the above-listed incidents could reasonably be deemed race-based.[16] Accordingly, the Court will proceed to the next step of the Title VI analysis with solely those incidents in mind.

### 4.1.2 Pervasiveness of the Alleged Incidents

The Court must next address whether the alleged harassment was so pervasive and objectively offensive as to deprive the victim(s) of access to educational opportunities and benefits. *Galster*, 768 F.3d at 617. "In the education context, courts have required consistent and or severe misconduct, such as physical threats, the use of racial epithets, violence, or

_____

[15]The record does not clearly identify the race of these other two students, making it difficult to discern whether the bus driver's conduct was or was not possibly motivated by race. However, L.H. told Schimmel that she believed the "driver treated her differently than the other two girls because she is black," which suggests that the other two students who were allowed to exit the bus are not Black. A reasonable juror could therefore find that this incident was racial in nature.

The Court must also address Defendants' argument that this incident, and others not inflicted by another student, should not be considered because it is "not a peer-to-peer race-based harassment incident." ECF No. 144 at 4. The Court disagrees. Peer-to-peer claims are also commonly referred to more generally as hostile environment claims. Courts have held that in "order to establish a 'hostile environment' claim, a plaintiff must show that: 1) the school district was 'deliberately indifferent' to known acts of harassment by *teachers or peers* . . . ." *Booker v. Bangor Area Sch. Dist.*, No. 14-cv-5242, 2015 U.S. Dist. LEXIS 37506, at *7 (E.D. Penn. Mar. 24, 2015) (emphasis added) (citation omitted). *See also Doe v. Defendant A,* No. 12-CV-392-JHP-TLW, 2012 U.S. Dist. LEXIS 180972, at *14 (N.D. Ok. Dec. 21, 2012) ("The Court has no doubt that there are circumstances where a school district has sufficient control over the harasser and the environment to confer the ability to remedy the harassment on a school district even though the harasser is not a school district employee.").

[16]Defendants concede that the incidents alleged involving L.H. all "arguably include language which could lead a reasonable fact finder to conclude that they may have been motivated by race." ECF No. 125 at 7.

sexual contact and abuse at school to establish a hostile environment claim." *Ervins v. Sun Prairie Area Sch. Dist.*, 609 F. Supp. 3d 709, 722 (W.D. Wis. 2022). "[A] hostile environment claim requires much more than a single upsetting episode." *Id.* Furthermore, "[f]ederal law does not protect students from commonplace schoolyard altercations, including name-calling, teasing, and minor physical scuffles." *Galster*, 768 F.3d at 618.

However, "numerous or incessant" minor scuffles and incidents could, in the aggregate, qualify as severe harassment for purposes of Title VI. *Id.* ("We assume that relatively minor incidents could be so numerous or incessant as to qualify as severe harassment . . . .") ("A reasonable jury could find that the *cumulative effects* of this abuse were comparable to harassment found in rare cases to be sufficiently severe under Title VI and Title IX.") (emphasis added); *see also Bowe v. Eau Claire Area Sch. Dist.*, No. 16-cv-746-jdp, 2017 U.S. Dist. LEXIS 61496, at *6 (W.D. Wis. Apr. 24, 2017) ("When some incidents of harassment are alleged to be based on the plaintiff's protected status, the court may consider allegations of other, more generalized harassment when determining whether the alleged harassment is severe enough to state a peer-harassment claim.").

The Court must therefore focus on the above-listed incidents that could reasonably be deemed racial in nature to determine whether they were so "pervasive, and objectively offensive" as to have a "concrete, negative effect" on M.R. and L.H.'s access to educational opportunities and benefits. *See Galster*, 768 F.3d at 617; *N.K.*, 965 F. Supp. 2d at 1033.

A concrete, negative effect on a victim may present itself in different ways. For example, it may include "dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource." *C.S. v. Couch*, 843 F. Supp. 2d

894, 907 (N.D. Ind. 2011). And the educational opportunities and benefits to which a victim's access is affected need not necessarily be tangible. "Educational benefits include an academic environment free from racial hostility." *Zeno*, 702 F.3d at 666.

A reasonable juror could find that the extensive list of race-based incidents that L.H. and M.R. experienced were, in the aggregate, pervasive and objectively offensive and had a "concrete, negative effect" on L.H. and M.R. *N.K.*, 965 F. Supp. 2d at 1033. Both L.H. and M.R. experienced relatively regular instances of racial, and generalized, harassment. *See Bowe*, 2017 U.S. Dist. LEXIS 61496, at *6. These incidents followed them from school to school. "There is no question . . . that repeatedly 'being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race' is harassment far beyond normal schoolyard teasing and bullying." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (internal citation omitted); *see also DiStiso v. Cook*, 691 F.3d 226, 242–43 (2d Cir. 2012) ("Defendants do not—and cannot—dispute that such conduct, particularly use of the reviled epithet [N-word], raises a question of severe harassment going beyond simple teasing and name-calling."). And this is not a case in which the plaintiffs can point to no more than a "single upsetting episode." *Ervins,* 609 F. Supp. 3d at 722.

Garbade kept M.R. out of school for several days, and M.R. did not ride the bus on multiple occasions, because M.R. did not feel safe. L.H.'s GPA dropped, which she attributes at least partially to the racial harassment she experienced at school. M.R. and L.H. both sought therapy and mental health treatment to address the trauma and stress they experienced at school. Each was eventually transferred from their

respective schools because of the persistent harassment. *See Preusser v. Taconic Hills Cent. Sch. Dist.*, No. 1:10-CV-1347(MAD/CFH), 2013 U.S. Dist. LEXIS 7057, at *34 (N.D.N.Y. Jan. 17, 2013) ("District courts have held that removal or withdrawal from school to avoid further harassment may . . . constitute a deprivation of resources."). Clearly, the above-listed incidents had a concrete, negative effect on L.H. and M.R. and their abilities to attend school without fear of harassment. *See Couch*, 843 F. Supp. at 907 ("If the plaintiff also experienced some kind of emotional trauma as a result of the harassment, like suicidal thoughts or a diagnosis of depression, in addition to the more tangible effects such as dropping grades or increased absenteeism, then such trauma can contribute to a conclusion that the severity and pervasiveness requirement is satisfied.").

### 4.1.3   Actual Knowledge

The Court next examines whether BASD "had actual knowledge of the alleged harassment . . . ." *N.K.*, 965 F. Supp. 2d at 1034. The standard for actual knowledge "is not satisfied by knowledge that something might be happening and could be uncovered by further investigation." *Galster*, 768 F.3d at 617–18. "School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Id*. at 618.[17]

_____

[17]This authority somewhat undermines Plaintiffs' argument that BASD had "adequate notice" of some incidents never witnessed by or reported to BASD merely because of "the number of incidents that were reported to the District" which gave it "more than adequate notice of a racially hostile environment such that it should have been investigating and aware of the on-going racial issues." ECF No. 129 at 10. "[T]his argument only establishes that the [school officials] *should have known* of the [harassment], which is not enough to establish *actual* knowledge of [the harassment]." *Davis v. Carmel Clay Schs*., 570 F. App'x 602, 606 (7th Cir. 2014). It is true that a "school district must respond with measures to both 'end the harassment' of which it has knowledge and 'to limit further harassment,'" and that a school official cannot "bur[y] his head in the sand to avoid acquiring

### 4.1.3.1 As to the Incidents Involving M.R.

Each of the incidents that could reasonably be deemed racial in nature and which M.R. experienced were either reported to or witnessed by BASD officials. For example, Syens was promptly involved in the toy airsoft gun incident, and Schimmel was promptly made aware of the instance in which M.R. was issued a bus ticket. Similarly, a BASD employee witnessed the unknown student on M.R.'s bus singing the song about tying a noose and promptly notified a BASD official. The rest of the listed incidents involving M.R. were reported by Garbade as early as January 2019.

### 4.1.3.2 As to the Incidents Involving L.H.

In contrast to those involving M.R., many of the aforementioned incidents experienced by L.H. were not reported in any capacity to any BASD or school officials, nor is there any evidence to suggest that anyone from BASD witnessed them.[18] Because there is no evidence that BASD or its

---

knowledge of past or ongoing misconduct," but at the same time a school district need not go out searching for instances of harassment. *See C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 542, 545 (7th Cir. 2022).

[18]When a student commented on L.H.'s afro, she did not tell anyone except Garbade about it, and she did not know if any staff members were around to hear the comment. Nor did Garbade recall reporting that incident.

The same is true for the incident in which a student said, "of course it was the only two black kids who got the highest score." Neither L.H. nor Garbade recalled reporting this comment to anyone. L.H. testified that she thought the gym teacher was close by, but she did not know whether the teacher heard the comment, and "reliance on speculation is not enough to get the case to a jury." *Overly*, 662 F.3d at 864.

L.H. also testified that a girl on the bus in either seventh or eighth grade told her that she was "pretty for a black girl," but L.H. did not tell anyone, including Garbade, until late 2022, at which point L.H. had already left BASD.

When a student asked L.H., the only Black student in the classroom, why all "Black people liked chicken," the teacher was not in the classroom, and neither L.H. nor Garbade reported the incident. According to the record, there "may have

agents had actual knowledge of these incidents during L.H.'s time in BASD, the Court must disregard them for purposes of its Title VI analysis.

Some of the incidents experienced by L.H. were eventually reported by Garbade, but not until well after they happened. For example, during the 2016–2017 school year, a student reportedly told L.H. she was illiterate because she is Black, and a student used the N-word regularly on the bus in front of L.H. Garbade did not report these incidents until, or shortly after, she made her official racial discrimination complaint years later in March 2020. L.H. also recalled an occasion where a white student told L.H. she was a "smart black girl." L.H. did not recall when this happened, nor did she recall if it even happened at school,[19] but Garbade reported it by email to a teacher in early March 2020. When a student made a comment to L.H. about the growth rate of Black hair in the 2018–2019 school year, it too was not reported until March 2020. And for context, Garbade pulled L.H. from BASD to attend school elsewhere that summer, just a few months after Garbade brought these incidents to BASD's attention.

The parties dispute the effect of this late reporting. Defendants argue that these later-reported incidents must be disregarded for purposes of the analysis because they were not "timely" made to an "appropriate person." ECF No. 125 at 9. In response, Plaintiffs argue that there is nothing to

---

been an aide in the room," but again, "reliance on speculation is not enough to get the case to a jury." *Id*.

L.H. testified that a girl told her she was doing "white face" at a color run, but the record shows that no one made the school or BASD aware of this.

[19]This context provides a basis for disregarding this incident in the remainder of the analysis because the alleged misconduct "must take place in a context subject to the school district's control," such as "during school hours and on school grounds." *Davis*, 526 U.S. at 645 (Title IX context).

support the claim that "incidents of racial harassment are excluded from evidence unless there is an immediate report of each incident to a school district." ECF No. 129 at 10. Plaintiffs exaggerate Defendants' argument. Defendants nowhere suggest that the school district must be made "immediate[ly] aware" of a race-based incident.

Instead, Defendants argue that incidents that are so untimely reported that the harassment has "already concluded" cannot support a Title VI violation. ECF No. 125 at 9. In support of that assertion, they cite *Davis*, 570 F. App'x at 607.[20] In that case, the Seventh Circuit affirmed the grant of summary judgment for the defendant school district because "the admissible evidence [did] not establish that the School *actually* knew about the [students'] mistreatment of M.D. until after the mistreatment ceased (and shortly before the School began its investigation)." *Id.* at 605. The court concluded that "at best, the plaintiffs' evidence establishe[d] that the School developed actual knowledge of the [students'] mistreatment of M.D. only *after* the mistreatment ceased." *Id.* at 607. For that reason, the plaintiffs' peer harassment claim failed. *Id.*

At the same time, however, a "school district must respond with measures to both 'end the harassment' of which it has knowledge" *as well as* "to limit further harassment." *C.S.*, 34 F.4th at 542 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 289 (1998)). "Risk qua risk . . . is not actionable, but past misconduct revealing risks of further discrimination

---

[20]Plaintiffs inexplicably assert that the "only legal authority defendants cite for the proposition that untimely reporting warrants wholesale disregard of these incidents is *Upchurch v. Multnomah Univ.*, 2021 U.S. Dist. LEXIS 251742 (D. Ore. Dec. 31, 2021)." ECF No. 129 at 10–11. That citation appears nowhere in Defendants' brief—they do not reference that case at all. *See* ECF No. 144 at 6 n.3.

requires the school district to respond accordingly." *Id*. Although these late-reported incidents were brought to BASD's attention mere months before L.H. would leave BASD entirely, there remained at that point a not entirely insignificant portion of the school year during which L.H. remained at risk for further racial harassment.[21] Once BASD became aware in March 2020 of the incidents from prior school years, it had an obligation to "respond accordingly" to prevent further incidents against L.H. *Id*. These incidents will therefore proceed in the analysis.

Some of the remaining incidents as to L.H. were timelier reported to a BASD official. In the 2019–2020 school year, when a student used the "N-word" around and in reference to L.H. and when a student compared Black people to black jellybeans, Garbade reported these incidents by email in September 2019. When a student in the 2019–2020 school year spoke negatively about mixed race dating, L.H. reported it to Heft. And when L.H. was disallowed from exiting the bus notwithstanding her note, Schimmel became almost immediately aware of it because L.H. was called to his office. These incidents will therefore also proceed in the analysis.

Further discussion is required as to the remaining incidents for which a reasonable juror could conclude a teacher or other school official was put on notice. For example, when students repeatedly used the "N-word" during the school dance, multiple school employees—including then-principal Burling—were present and chaperoning the event, allowing for the reasonable inference that they heard this language. Similarly, when a student in a ninth-grade class told L.H. that Black people "don't work as hard as white people do," L.H. looked directly behind her to where her

---

[21]The 2019–2020 school year concluded on June 5, 2020. ECF No. 37 at 3.

teacher stood, waiting for him to say something. This allows for the reasonable inference that the teacher heard the comment. *See S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *14.

The issue, however, is that Title VI requires that a "school official who possessed the requisite control over the situation" had actual knowledge of the incident. *Couch*, 843 F. Supp. 2d at 913 (citing *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999)). Courts have held that the official must be "high enough up the chain-of-command that his acts constitute an official decision by the [educational institution] itself not to remedy the misconduct." *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999). This requisite is clearly satisfied for the incident at the school dance because the school principal was among those chaperoning the event.[22] But whether that requisite is satisfied by a teacher having actual knowledge of the incident is less clear.

The Tenth Circuit declined in *Murrell* to "name job titles that would or would not adequately satisfy this requirement," recognizing that "[b]ecause officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." 186 F.3d at 1247. It noted, however, that "[w]here the victim is complaining about a fellow student's action 'during school hours and on school grounds,' . . . teachers may well possess the

---

[22] *See Murrell*, 186 F.3d at 1247 ("[A] school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision, would meet this definition."); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009) ("It is apparent from Supreme Court precedent . . . that school principals are considered 'appropriate persons' in the Title IX analysis.").

requisite control necessary to take corrective action to end the discrimination." *Id*. at 1248 (internal citation omitted). Most other courts that have addressed the issue have concluded otherwise.[23] Even if the Court were to concur with this latter bulk of authority, that conclusion would ultimately be immaterial in this case because this incident was eventually reported to BASD by Garbade as part of her March 2020 complaint.

For the sake of clarity, the Court will list the incidents that could reasonably be deemed racial in nature *and* of which a reasonable juror could find that BASD had actual knowledge at some point while L.H. and M.R. were still students at BASD:

- When M.R. brought a toy gun to school, Syens informed her that a Black child had been shot and killed by police for having a toy gun.

- When M.R. was repeatedly called "asswipe," "black girl," and similar racially charged names.

---

[23]In *DT v. Somers Central School District*, for example, the court wrote that because "Title VI requires actual notice, the principle of *respondeat superior* will not impute [the teacher's] knowledge of the [classroom incident] to defendants." 588 F. Supp. 2d 485, 494 (S.D.N.Y. 2008); *see also T.E. v. Pine Bush Cent. Sch. Dist.,* 58 F. Supp. 3d 332, 359 (S.D.N.Y. 2014) ("[I]mputing knowledge on the part of the teachers to the District would undermine Title VI's clear bar on *respondeat superior* liability."); *Tuggles,* 2009 U.S. Dist. LEXIS 92495, at *68–69 (same); *DT v. Somers Cent. Sch. Dist.,* 348 F. App'x 697, 700 (2d Cir. 2009) (expressing disinclination to accept plaintiff's argument that court should impute witness teacher's knowledge of racial harassment to the school district based on agency principles, but dismissing claim on other grounds); *Plamp,* 565 F.3d at 457–58 ("[W]hile we do not hold that school guidance counselors and teachers are always without the authority necessary to institute corrective measures or lack sufficient control to take remedial action, the record in this case does not support a finding that . . . the Mitchell High School teachers were 'appropriate persons' within the meaning of the statute.").

- When a student told M.R. something to the effect of, "[w]hen the lights are off you can't see black people," and then threw a hair clip at her face.

- When an unknown student sang a song about tying a noose on M.R.'s bus.

- When a student asked M.R. if she had a Black boyfriend.

- When students made mean comments about M.R.'s hair.

- When M.R. got a bus ticket for sitting sideways on the bus even though other students on the bus, including white students, were also sitting sideways.

- When a student told L.H. she was illiterate because she was Black.

- When a student used the "N-word" around and in reference to L.H.

- When a student made a comment about mixed-race dating.

- When a student commented that Black people were like jellybeans.

- When students loudly and repeatedly sang the "N-word" at the school dance in front of L.H.

- When a student told L.H. she was smart for a Black girl.

- When L.H. was disallowed from exiting the bus, notwithstanding her permission note, while two other students were allowed to exit the bus without a permission note.

- When a student told L.H. that Black people "don't work as hard as white people do."

### 4.1.4   Deliberate Indifference

Finally, the Court must look at those incidents that have survived the analysis thus far and determine whether BASD's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *N.K.*, 965 F. Supp. 2d at 1035 (internal citation omitted).

"[D]eliberate indifference is a high bar for plaintiffs to clear: it exists 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id.* (internal citation omitted); *see also Galster*, 768 F.3d at 619 ("School administrators must 'continue to enjoy the flexibility they require' in disciplinary decisions unless their response to harassment is 'clearly unreasonable.'"). Importantly, "this 'does [not] require funding recipients to remedy peer harassment' or punish every allegedly offending student." *N.K.*, 965 F. Supp. 2d at 1034 (internal citation omitted). Nor does it require any specific form of disciplinary action or remedial measure. *Galster*, 768 F.3d at 619, 621; *S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *5 ("[O]fficials are given wide discretion as to how to respond."). "Nor is a district liable simply because it could have handled the matter differently or better." *S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *5; *see also DT*, 588 F. Supp. 2d at 496 ("[C]ourts have been skeptical of arguments premised on the degree to which a school punishes its students.").

"[A] school district does not violate Title VI with acts (or inactions) that are merely negligent." *S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *13. Furthermore, it is appropriate for a school to "take into consideration administrative burdens or the disruption of other students' or their teachers' schedules in determining an appropriate response [to peer harassment]." *Galster*, 768 F.3d at 619 (internal citation omitted). And again, "the Court must remain cognizant of the fact that it may only look to instances where [the defendant] had at least actual notice of the incidents to determine that they were deliberately indifferent to those incidents." *N.K.*, 965 F. Supp. 2d at 1036.

### 4.1.4.1   As to M.R.

For many of the incidents listed above involving M.R., BASD or Schimmel imposed discipline to the offending student or otherwise reasonably responded to the incident.

Specifically, when a student commented about not being able to see Black people when the lights are off and then hit M.R. with a hair clip, Schimmel spoke with the bus company, assigned the student detention, informed Garbade of this discipline, and asked Garbade to have M.R. report if the student made any additional comment towards her. When a student asked M.R. if she had a Black boyfriend, Schimmel investigated and issued the student a cease-and-desist contract. When M.R. got a bus ticket, Schimmel spoke with M.R. and the bus company, confirmed that M.R. had violated bus policy, and reviewed bus expectations with her. When M.R. was called "asswipe" on the bus, BASD officials reviewed the bus surveillance video, spoke with the offending student, confirmed that he used inappropriate language, and assigned him a seat on the bus for over three weeks as discipline. Schimmel also brought the students together to discuss what happened, and all students acknowledged that their language was not appropriate. Schimmel then updated Garbade about BASD's response to the situation. And when BASD became aware that M.R. had brought a toy airsoft gun, rather than a BB gun, to school and on the bus, Smet met with Garbade and apologized to her, Syens sent out a correction email clarifying that no BB gun had been brought to school and reminding parents that even imitation toy weapons were violative of school policy, and Smet agreed to retract the suspension that had been issued to M.R.

These responses were not "clearly unreasonable" as to amount to deliberate indifference, and no reasonable juror could conclude otherwise. *N.K.*, 965 F. Supp. 2d at 1035 (quoting *Davis,* 526 U.S. at 648).[24]

For the remaining incidents, it does not appear that any particular discipline was issued. For example, when BASD staff observed an unknown student on the bus singing a song about tying a noose, the staff member emailed Schimmel about it to alert him but did not actually intervene. Schimmel emailed Garbade about this incident that same day, advising her that there was an aid assigned to the bus and that the aid had taken notes on the behavior, which he would address. The record does not indicate whether or to what extent Schimmel followed up. And when students made mean comments about M.R.'s hair and her bun, it is not clear what, if any, discipline resulted. However, school districts are "not required to take disciplinary action against *every* student accused of misconduct" as a matter of law. *Id.* at 1036. Moreover, in response to the situation as a whole, Schimmel and Smet coordinated with Garbade to implement a daily check-in system to encourage M.R. to report any further incidents should she feel the need to do so.

---

[24]M.R. did originally receive a one-day suspension for violating the school policy by bringing an imitation weapon to school. The record does not disclose whether other students had ever been disciplined for bringing toy weapons to school. But it does provide that multiple students who brought knives onto school property were disciplined with suspensions, parental notification, and/or police notification. In one instance where a student was not disciplined after bringing a knife to school, the disparity in treatment could reasonably be explained by the difference in intent—that student had forgotten the knife was in his bag from Boy Scouts, had no intention of bringing it to school, and disclosed it to his teacher upon discovering it. In contrast, M.R. intended to bring the violative toy airsoft gun to school and to have it out.

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 46 of 65   Document 148

In sum, the record does not reasonably allow for the conclusion that BASD's handling of the incidents involving M.R. amounted to deliberate indifference. Deliberate indifference is a high bar, and Plaintiffs have not met it with respect to M.R.'s experiences. The record fails to raise a genuine dispute that BASD's responses to the incidents involving M.R. of which it was actually aware were clearly unreasonable.

Plaintiffs are dissatisfied with the responses taken by BASD. They write that "despite the clear trajectory of escalating race-based hostility and physical violence, the District did nothing other than treat these as individual peer squabbles that were addressed only with discipline, or not at all." ECF No. 129 at 20. But if not with discipline, then with what? Title VI does not entitle Plaintiffs to any particular response or specific form of discipline. *Galster*, 768 F.3d at 619, 621. They are not entitled to have every instance of harassment remedied and every offending student punished. *N.K.*, 965 F. Supp. 2d at 1036 (internal citation omitted). School districts such as BASD are entitled to wide latitude in determining which incidents of harassment to address and how to address them as a matter of law. *S.Q.*, 2022 U.S. Dist. LEXIS 111167, at *5. And some of the disciplinary responses taken by BASD—such as detention—cannot be described as trivial.

BASD is not liable under Title VI because it "could have handled the matter differently or better." *Id.*; *see also Couch*, 843 F. Supp. 2d at 912 ("While [defendants] could have done more, like instituting a diversity program . . . they are not required to remedy peer harassment, and, therefore, the fact that they did not remedy it does not make what they did do—investigate the incidents and punish those responsible—clearly unreasonable."). Indeed, the Supreme Court has instructed courts to

"refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.[25]

For the most part, BASD "officials investigated incidents after they were reported, spoke with students," communicated with the students and parents involved regarding the harassment, and "took regular and positive action to address the situation." *N.K.*, 965 F. Supp. 2d at 1035. For those reasons, the Court will grant Defendants' motion for summary judgment on the Title VI claim to the extent that it relates to M.R.'s experience.

### 4.1.4.2    As to L.H.

The Court will next evaluate whether BASD was deliberately indifferent to the racial harassment experienced by L.H. and of which it could be deemed to have had actual knowledge. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the record reasonably allows for that inquiry to be answered in the affirmative.

---

[25]In support of their argument that BASD was deliberately indifferent to the racial harassment, Plaintiffs rely, *inter alia*, on the "Assistant State Superintendent['s]" conclusion, following Garbade's official complaint and appeal of BASD's determination thereof, that there "is little evidence in the record that BASD conducted any investigation into a larger problem at the district" and "seemingly only responded to certain discrete allegations . . . [without] tak[ing] the further step of considering, or investigating, whether the environment in BASD was racially hostile . . . globally." ECF No. 129 at 18–19. Plaintiffs ask the Court to take this and the Wisconsin Department of Public Instruction's conclusion that BASD "failed to respond adequately to redress the hostile racial environment which existed in the District" into consideration. *Id*. at 1–2 & n.1 (citing ECF No. 123 at 75).

Even if this evidence can be considered on summary judgment, it is not entirely clear to how much weight it would be entitled. *See Hill v. Blount Cnty. Bd. of Educ.*, 203 F. Supp. 3d 871, 882 (E.D. Tenn. 2016) (discussing admissibility of investigative report prepared by state's department of education and noting that the "Sixth Circuit has concluded that administrative findings do not create a material issue of fact when the court has access to just as much of the evidence as the agency did").

During the ninth grade, students at the school dance loudly sang the N-word in front of L.H. and in front of school chaperones. Later, in or around September 2019, a student called L.H. the N-word on the bus, and a student allegedly said that Black "people are like jellybeans, no one likes the black ones." Garbade reported these two latter incidents shortly thereafter. The record is devoid of any response on the part of BASD to these instances of misconduct.[26] It does not appear that they were investigated or followed-up on in any form. "[S]ummary judgment should be precluded where the school made no effort to stop harassment . . . . " *N.K.*, 965 F. Supp. 2d at 1036 (citations omitted); *Couch*, 843 F. Supp. at 911 ("[C]ourts have found the issue of deliberate indifference to preclude dismissal or a grant of summary judgment when the school made no effort whatsoever to either investigate harassment, stop it, or discipline the offending student.").

As noted earlier, once BASD became aware in March 2020 of the incidents involving L.H., it had an obligation to "respond accordingly" to prevent further incidents. *C.S.*, 34 F.4th at 542. In some sense, BASD did so—by promptly commencing an investigation into the official complaint. At that point, having just been made aware of incidents that reportedly occurred up to several years prior, BASD was entitled to begin by commencing an investigation. Plaintiffs could not reasonably expect that prompt discipline would issue for these older incidents in the absence of appropriate investigation and corroboration. *See S.Q.*, 2022 U.S. Dist. LEXIS

---

[26]Also during the ninth grade, a student made a negative comment to L.H. about mixed race dating. BASD officials responded appropriately to that incident—the offending student spoke with both Heft and the school counselor, wrote an apology letter, and served a lunch detention for three days. As explained below, this response appears to have been the exception, not the rule, at BHS.

111167, at *12 ("It is not appropriate for the court to second-guess an administrator's conclusion that he lacked evidence sufficient to discipline a student.") (citation omitted).

But the investigation explicitly excluded allegations "related to [BHS]," and it does not appear that BASD or its officials engaged in any separate investigation or follow up into those allegations. Additionally, for the incidents of which BASD was made aware much earlier (as early as September 2019) and for which no response or discipline appears to have been undertaken or even contemplated, a reasonable juror could find deliberate indifference. In stark contrast to BASD's response to the harassment suffered by M.R., there appears to have been almost no response to the known harassment suffered by L.H. Accordingly, the Court will deny Defendants' motion for summary judgment in that respect.

### 4.2    Title VI Disparate Treatment Claim

Plaintiffs also raise a Title VI disparate treatment claim, although their briefing thereon is shoddy at best. In support, Plaintiffs argue that Syens' response to M.R.'s bringing the toy airsoft gun to school was "based on her race." ECF No. 129 at 23. Plaintiffs further contend that M.R. was treated disparately based on her race when Schimmel imposed discipline against her for "t[aking] some snacks she was not supposed to," when the bus driver issued her a ticket for "sitting sideways on the bus," and when Schimmel issued M.R. detention for her behavior in the cafeteria. *Id*. at 25.

"Adjusting terms for the educational context," the elements of a prima facie Title VI disparate treatment claim are "membership in a protected class, meeting the school's legitimate expectations, an adverse educational action[,] and worse treatment than that of similarly situated

students not in the protected class." *Brewer v. Bd. of Trs.*, 479 F.3d 908, 921 (7th Cir. 2007) (citations omitted).

"Case law is sparse on what qualifies as an adverse action under Title VI." *Stafford v. George Washington Univ.*, No. 18-cv-2789 (CRC), 2019 U.S. Dist. LEXIS 94088, at *31 (D.C.C. June 5, 2019) (holding that student's temporary removal from tennis team constituted adverse action); *see also Sullivan v. Wake Forest Baptist Med. Ctr.*, No. 1:20CV281, 2022 U.S. Dist. LEXIS 66709, at *18–19 (M.D.N.C. Apr. 11, 2022) (assuming *arguendo* that "restrictions on Plaintiff's ability to learn from and engage with faculty . . . may constitute an adverse educational action under Title VI"); *Wanko v. Bd. of Trs. of Ind. Univ.*, No. 1:16-cv-02789-TWP-DML, 2018 U.S. Dist. LEXIS 127372, at *15 (S.D. Ind. July 30, 2018) (student being required to retake first year curriculum constituted adverse educational action); *Mackey v. Trs. of California State Univ.*, 31 Cal. App. 5th 640, 664 (Cal. Ct. App. 2019) (in Title VI context, "a plaintiff 'must present facts showing that she was deprived of access to educational benefits in a significant way'") (citation omitted); *id.* at 664–65 ("Although minor or trivial actions that merely upset a college athlete are not actionable, we look to the totality of circumstances to consider whether the freshmen plaintiffs can establish that they were deprived [of] the terms, conditions, or privileges of participation on their college team, including by being denied the opportunity to participate in an environment free from discrimination, harassment, or retaliation.").

Furthermore, "[a] Title VI plaintiff who has experienced disparate treatment does not have a claim unless that discriminatory treatment was intentional." *Resendez v. Prance*, No. 3:16-CV-862-JVB-MGG, 2018 U.S. Dist. LEXIS 117359, at *10 (N.D. Ind. Jan. 26, 2018) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). This "implies that a decision maker singled out a

particular group for disparate treatment and selected his course of action at least in part for the purpose of causing adverse effects on the identifiable group." *Id.* (citation omitted). "[T]he use of racially derogatory language is strong evidence of racial animus, an essential element of any equal protection claim." *Id.* at *11 (citation omitted).

When M.R. violated school policy by bringing the toy airsoft gun to school, the toy gun was taken away from her, and Syens was informed. Syens erroneously alerted parents that a BB gun had been brought to school. She also kept M.R. in her office for "the whole school day."[27] She told M.R. about a "black boy who was shot and killed by the police for having a toy gun, and they mistaken [sic] it for a real gun." Syens spoke with other students, and she confirmed that M.R. had the toy gun out at recess and was pretending to shoot at another student. Garbade was notified and instructed to come pick up M.R. M.R. was issued a one-day suspension, which Smet later said he would "retract" because he approved it "based on the notion that [M.R.] had brought an actual BB gun to school."

Defendants argue that "Syens' comments to [M.R.] while speaking to her . . . were not, themselves, adverse educational impacts that can give rise to a Title VI claim." ECF No. 144 at 13. The Court disagrees. A reasonable juror could conclude that this treatment constituted an adverse educational action.[28] Being held in the principal's office for the entire day,

---

[27]The record provides that Syens' conversation with M.R. lasted only "20 minutes" but that M.R. was apparently kept in Syens' office for "the whole school day." ECF No. 123 at 8.

[28]Defendants cite to *Brown v. Advocate South Suburban Hospital and Advocate Health & Hospitals Corporation*, 700 F.3d 1101 (7th Cir. 2012) in support of their argument that Syens' conduct did not constitute an adverse educational action. *Brown* held that adult employees "not being listened to," getting "a cold shoulder

interrogated, and told about a Black child with a toy gun being killed by police could, together, reasonably be considered an adverse educational action. It deprived M.R. of the ability to participate in class for the day, and it also traumatized her to the point of needing therapy.

A reasonable juror could also find that M.R. was treated worse than similarly situated students in this situation because of her race. The record describes various other situations in which students brought weapons to school and received discipline, including parental notification, out-of-school suspension, detention, and referral to police. But there do not appear to have been any other situations in which a student was kept in the principal's office for the entire day to be interrogated and told about a child of their own race being killed by police for similar conduct. Although it is true that Smet agreed to retract the suspension that had been issued to M.R., M.R. had already gone through the traumatic and emotional experience of having her school principal tell her about a child of her own race being killed by police. Syens conceded that she would not have told a white student about a Black child getting shot and killed by police. In this regard, the record allows for the reasonable inference that other students accused of similar misconduct were treated more favorably by not being expressly reminded of a historical pattern of violence inflicted against members of their race. It will be up to a jury to determine whether that treatment is "worse" than the typical, formal discipline issued against other students.

_____

from management," and being accused of being cry babies and trouble makers did not constitute a "materially adverse employment action." *Id*. at 1107. This behavior—directed by an adult at another adult—is not equivalent to a school principal interrogating and telling a Black child about another Black child getting killed by police for having a toy gun.

The Court will next discuss the incident in which Schimmel issued M.R. a detention for misconduct in the cafeteria. The parties dispute the motivation for the issuance of the detention. The agreed upon statement of facts provides that it was issued not because M.R. was "being too loud, but for being disrespectful." In contrast, Plaintiffs write that Schimmel told them the "detention was for [M.R.] being too loud." ECF No. 137 at 1. M.R. herself does not even "remember any details other than that she received a detention." Plaintiffs further assert that "all the students in the cafeteria were loud" and that Garbade knew this because she regularly attended school lunch with M.R. and witnessed it herself. *Id*. at 2.

There is no evidence from which a reasonable juror could conclude that the imposition of this detention was racially motivated. M.R. herself does not even recall the details. Garbade's opinions about what happened are based on her general assumptions, not based on having actually been with M.R. in the cafeteria on this specific occasion. A juror would have to rely on pure speculation in order to evaluate this claim. This incident does not, therefore, support Plaintiffs' Title VI disparate treatment claim.

Plaintiffs also allege that Schimmel treated M.R. disparately when he disciplined her for stealing snacks. The claim as to this incident fails, in part because the record does not allow for the reasonable inference that any discipline M.R. received had anything to do with her race. The parties provide essentially zero context for this alleged incident. There is no allegation or evidence that non-Black students who engaged in similar misconduct were treated more favorably. It is not even clear what discipline was allegedly imposed against M.R. The Court has no way, therefore, to determine whether it constituted an adverse educational action.

The Court must now address the incidents in which M.R. and L.H. allegedly received disparate treatment from bus drivers. Defendants allege that whatever interactions M.R. and L.H. had with the bus drivers cannot support a Title VI disparate treatment claim against BASD. ECF No. 125 at 16 n.12. Plaintiffs do not address this contention.

The Court agrees with Defendants. As noted, "there is no vicarious liability under Title VI; the entity cannot be held liable for discrimination solely because it employs a discriminating employee." *Shah v. Univ. of Toledo*, No. 3:21-CV-581, 2021 U.S. Dist. LEXIS 213004, at *9 (N.D. Ohio Nov. 4, 2021) (citation omitted).[29] The bus drivers are not BASD officials—their conduct cannot be imputed to BASD for purposes of Title VI.

Plaintiffs point to Schimmel's handling of the incidents after M.R. and L.H.'s interactions with the bus drivers. After M.R. was issued a bus ticket, Schimmel spoke with M.R. Schimmel also spoke with the bus company and confirmed that M.R. had been sitting sideways. Schimmel assigned no additional discipline to M.R. and instead "reviewed the expectations for sitting forward on the bus." Garbade asked Schimmel to evaluate the situation from the "perspective of unconscious bias" because she believed white students were also sitting sideways on the bus but did not receive bus tickets. But the fact that Garbade had to ask Schimmel to view the situation from the perspective of "unconscious bias" indicates that there was no intentional discrimination on the basis of race on Schimmel's part. Schimmel did not issue the bus ticket, and he imposed no discipline himself. There is no clear "adverse educational action" he is alleged to have

---

[29]In fact, the bus drivers "are neither employees nor independent contractors of the District."

Case 2:21-cv-01284-JPS    Filed 05/17/23    Page 55 of 65    Document 148

personally taken. *Brewer*, 479 F.3d at 921. Schimmel's involvement in this situation does not support Plaintiffs' Title VI disparate treatment claim.

Lastly, Plaintiffs allege that Schimmel's interaction with L.H. after L.H. was disallowed from exiting the bus for Girl Scouts constituted disparate treatment. For the same reasons as the prior incident, this interaction does not support Plaintiffs' Title VI disparate treatment claim. Schimmel was not involved in L.H. being disallowed from exiting the bus. Schimmel called L.H. to his office after the bus driver complained that L.H. was disrespectful. When L.H. told Schimmel that "two of her friends did not have notes and should have," and that she suspected she was treated differently than them because of her race, Schimmel told L.H. that they "were not talking about her friends; they were talking about [L.H.]."

Plaintiffs claim that a reasonable jury could find that Schimmel "handled" the situation disparately. ECF No. 129 at 25. But Plaintiffs do not point to any other situation in which Schimmel responded to a complaint about a student being disrespectful, let alone one in which he treated other such students more favorably. And again, there was no "adverse educational action" taken on Schimmel's part here. *Brewer*, 479 F.3d at 921.

For these reasons, the sole incident that a reasonable juror could find to support Plaintiffs' Title VI disparate treatment claim is Syens' response to the toy airsoft gun incident.

### 4.3 Fourteenth Amendment Claim Against Schimmel

Plaintiffs additionally bring a purported "second claim for relief" under the Fourteenth Amendment, and through 42 U.S.C. § 1983, against Schimmel in his individual capacity. ECF No. 1 at 4, 28–29. The contours of this claim are not entirely clear—the complaint uses the phrase "Fourteenth

Amendment" just once in its 63 total pages, when it states that Plaintiffs raise a claim "under the Fourteenth Amendment . . . against Principal Scott Schimmel for depriving [Plaintiffs] of their federal statutory right of access to educational benefits." *Id*. at 4. The complaint never references the Equal Protection Clause. It provides little elaboration, providing only that Schimmel treated M.R. disparately based on her race. *See* ECF No. 125 at 1 (Defendants' brief in support of summary judgment, speculating that Plaintiffs' second claim for relief is brought pursuant to the Fourteenth Amendment's Equal Protection Clause).

Plaintiffs' brief in opposition is not particularly clarifying. Plaintiffs contend that there is "more than sufficient evidence for a reasonable jury to conclude that Schimmel violated the plaintiffs' § 1983 rights," ECF No. 129 at 28, but the use of the phrase "§ 1983 rights" in this sense is itself erroneous. Section 1983 does not create or convey any rights. "It creates no substantive cause of action, but merely provides 'a method of vindicating federal rights *elsewhere conferred*.'" *Martin v. Dupont Hosp.*, No. 1:09-CV-47-PPS, 2010 U.S. Dist. LEXIS 55745, at *5 (N.D. Ind. June 7, 2010) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)) (emphasis added). There is no such thing as "§ 1983 rights." *Levin v. Madigan*, 692 F.3d 607, 611 (7th Cir. 2012) ("Section 1983 does not create substantive rights.").

Needless to say, neither Defendants nor the Court should have to speculate about the contours of this, or any, claim. The claim is, quite simply, underdeveloped and poorly pleaded and briefed. *See Williams v. Ill. Dep't of Corr.*, No. 3:19-CV-739-MAB, 2023 U.S. Dist. LEXIS 17867, at *81 (S.D. Ill. Feb. 2, 2023). Nevertheless, the Court will proceed to its merits.

Plaintiffs cite to *DiStiso*, 691 F.3d 226, and to *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010), ostensibly for the standard for this claim. ECF No. 129

at 25–26. But the portion of *Grindle* to which Plaintiffs cite relates to supervisory liability, a concept that is never developed—let alone mentioned—in the complaint, or elsewhere, as far as the Court can discern. *Grindle*, 599 F.3d at 588 ("[S]upervisors can violate the Constitution themselves if they 'know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'") (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)). The Court will not evaluate the claim as one of supervisory liability. "It would defeat [the purpose of summary judgment] if Plaintiff were allowed to proceed to trial on a claim whose contours she has never clearly articulated." *Williams*, 2023 U.S. Dist. LEXIS 17867, at *81; *see also Chi. Mercantile Exch. Inc. v. ICE Clear US, Inc.*, No. 18-C-1376, 2020 U.S. Dist. LEXIS 63982, at *8 (N.D. Ill. Apr. 12, 2020) ("[A] defendant cannot win summary judgment on a claim the plaintiff never pleaded.") (citation omitted). If Plaintiffs intended to bring a claim against Schimmel for supervisory liability, specifically, they ought to have amended their complaint, or sought leave to do so, for that purpose.

More applicable is *DiStiso*, which provides that "claims of intentional race discrimination can be based on the 'deliberate indifference' of school boards, administrators, and teachers to invidious 'harassment, in the school environment, of a student by other children or parents.'" 691 F.3d at 240–41 (quoting *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999)). Specifically,

> to succeed on a § 1983 equal protection claim of deliberate indifference to student-on-student racial harassment, well established law requires a plaintiff to prove (1) that the child in question was in fact harassed by other students based on his race, . . . (2) that such race-based harassment was 'actually

known' to the defendant school official, . . . and (3) that the defendant's response to such harassment was so 'clearly unreasonable in light of the known circumstances' as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur . . . .

*Id.* at 241 (quoting *Gant*, 195 F.3d 140–41 & n.6). "As with a Title VI claim, in order for a plaintiff to succeed on a[n] equal protection claim, he is 'required to prove intentional racial discrimination.'" *Oliveras v. Saranac Lake Cent. Sch. Dist.*, No. 8:11-cv-1110 (MAD/CFH), 2014 U.S. Dist. LEXIS 44603, at *57 (N.D.N.Y. Mar. 31, 2014) (citation omitted). Ultimately, "[t]he standard for establishing deliberate indifference with regard to equal protection claims is 'substantially the same' as with regard to Title VI claims." *Waters v. Perkins Loc. Sch. Dist. Bd. of Educ.*, No. 3:12-cv-00732, 2014 U.S. Dist. LEXIS 44415, at *18 (N.D. Ohio Mar. 31, 2014) (citation omitted).

This Order has already established that both M.R. and L.H. experienced incidents of harassment by other students based on their race. But it has not clarified of which of those incidents Schimmel, specifically— as opposed to BASD, generally—had notice. Plaintiffs provide little to no assistance on that front. They assert that their earlier briefing established "how defendants had actual notice of racial harassment." ECF No. 129 at 26. But since this claim is against Schimmel individually, whether "defendants," plural, had notice of the racial harassment is not the issue. *Id*. Plaintiffs then say, in wholly conclusory fashion, that "[t]he facts specific to Schimmel's actual knowledge are also in the parties' stipulated statement of facts." *Id*. In support of that assertion, they cite to the entirety of the parties' 76-page statement of agreed upon facts, with no pincites.

The Court has already spent far too much time discerning the scope and contour of Plaintiffs' claims, including finding applicable case law

where the parties have not done so, and correcting Plaintiffs' erroneous assertions. *See, e.g., supra* n.20. "The parties' arguments—especially when both sides are represented by counsel—are precisely what frame a court's approach to an issue, and a court should be entitled to rely on what the parties argue in their briefs." *Studio & Partners, s.r.l. v. KI*, No. 06-C-0628, 2008 U.S. Dist. LEXIS 11321, at *32 (E.D. Wis. Feb. 14, 2008).

The critical issue is whether Schimmel's response to the incidents of racial harassment of which he was aware was clearly unreasonable. Plaintiffs focus on what Schimmel *didn't* do. For example, Schimmel did not recall any "proactive" steps he took to address racial harassment in the school, nor any "training that he made sure was provided to teachers, staff, or administrators to identify a peer conflict that would be racial in nature." Nor could he recall "reporting any complaints of race discrimination to Zinnen" during M.R.'s time at Dyer. In March 2019, when Garbade emailed Schimmel (and Smet) "where she could find BASD's policy regarding racial harassment," neither individual responded. Plaintiffs also take issue with Schimmel's statement that "the use of racial epithets would not have been

something he reported to Zinnen as race discrimination, but would have been something that would have been dealt with at the school level."[30, 31]

But the Court must also review what Schimmel *did* do in response to the incidents of racial harassment of which he was aware. When a student on the bus called M.R. a "black girl" and made other harassing comments, Schimmel communicated with the bus company and with the school resource officer regarding the possibility of issuing cease-and-desist contracts. Schimmel communicated with Garbade regarding "when and where the incident occurred and what students were involved." The student that called M.R. a "black girl" was issued a cease-and-desist

---

[30]The record also provides that BASD's anti-discrimination policy states that "any complaint shall be presented in writing or orally to the Complaint Officer," and that the "Complaint Officer shall thoroughly investigate the complaint . . . .," but that Schimmel did "not recall implementing" either of these steps with respect to any of M.R.'s complaints. Any failure on Schimmel's part to adhere to the school's policies and practices on handling racial harassment bears little, if any, weight in the analysis here as a matter of law. *See Williams v. Indep. Sch. Dist. No. 5*, No. 19-CV-499-JFJ, 2021 U.S. Dist. LEXIS 80382, at *18 (N.D. Okla. Apr. 27, 2021) ("[A] school district's failure to implement a sexual harassment policy or follow its own policy does not establish a violation of Title IX."); *Hill*, 203 F. Supp. 3d at 884 ("Lax enforcement of a school policy is not sufficient to establish discriminatory purpose.") (citation omitted); *Preusser*, 2013 U.S. Dist. LEXIS 7057, at *32 ("Upon receipt of a Title IX grievance, a school district is not required to proceed in a particular manner, even if there are policies in place that would appear to require the initiation of a formal investigation.").

[31]Plaintiffs also point to what they consider deficiencies in Schimmel's responses to other incidents. ECF No. 129 at 27 ("Schimmel was deliberately indifferent to [M.R.'s] racial hostile environment by . . . failing to contact [Garbade] when [M.R.] was seriously hurt or threatened, . . . including when [a student] dug her nails into [M.R.'s] arm, causing bleeding . . ., when [a student] punched her in the mouth loosening her tooth . . ., and when [a student] made the murder threat against her."). But the Court has already concluded that there is insufficient evidence from which a reasonable juror could infer that those incidents were based in race. Accordingly, the Court will not consider Schimmel's response(s) thereto as part of Plaintiffs' claim against Schimmel.

contract, and when that student later violated the contract, the student received detention. Schimmel also "honored" Garbade's request by removing another of the offending students from M.R.'s bus.

When a student told M.R. something to the effect of "when the lights are off you can't see black people" and hit her with a hair clip, Schimmel spoke with the bus company, notified the offending student's parents, and assigned the student detention. He also informed Garbade that the offending student was disciplined and to instruct M.R. to report if the student made any additional comments.

While "investigating an unrelated peer conflict issue," Schimmel learned that a student had asked M.R. if she "had a black boyfriend." Schimmel emailed Garbade and the offending student was issued a cease-and-desist contract.

When Schimmel was informed by a bus aide that an unknown student was singing a song about a noose on M.R.'s bus, Schimmel emailed Garbade that the bus was supervised by an aide and that Schimmel would address the offending student's behavior "tomorrow," although it is not clear whether or to what extent he did so.

When M.R. was called an "asswipe" on the bus, Schimmel (and other BASD officials) reviewed surveillance footage and spoke with the offending student. *Id*. at 39. Schimmel also spoke with M.R. The offending student was assigned a bus seat for over three weeks as discipline. Schimmel also reached out to the principal of another offending student and confirmed that student was disciplined. *Id*. Schimmel spoke with the offending students and M.R. as a group, at which time the students acknowledged that "their language was not appropriate." *Id*. Schimmel apprised Garbade

of this incident and his response to it. M.R. received no discipline, notwithstanding that she too used inappropriate language.

Schimmel also coordinated with Smet and Garbade to set up the daily check in system for M.R. to facilitate reporting of any harassment or bullying she continued to experience.

Schimmel's response was not "'so clearly unreasonable in light of the known circumstances' as to give rise to a reasonable inference" that Schimmel "himself intended for the harassment to occur . . . ." *DiStiso*, 691 F.3d at 241 (internal citation omitted). The Sixth Circuit's analysis in *Williams v. Port Huron School District* is relatively analogous:

> The plaintiffs argue, nonetheless, that Dahlke was deliberately indifferent because, among other things, he did not mandate that all teachers take action in response to hearing slurs, did not meet with students who overheard or were the subject of racial slurs, did not tell students how to file a complaint of harassment, and did not discipline anyone [related to a specific incident]. Plaintiffs further criticize Dahlke's perceived delay in taking action. But the plaintiffs "do not have a right to particular remedial demands," and Dahlke was "not required to remedy [racial] harassment nor . . . expel every student accused of misconduct." . . . Dahlke was required to "merely respond to known peer harassment in a manner that [was] not clearly unreasonable." . . . While there appears to be some disagreement as to whether Dahlke should have responded to the incidents in a different manner or taken further steps to identify the offending students, no one disputes that Dahlke made efforts to address the racial harassment and solicited the assistance of others to formulate a strategy . . . . Given Dahlke's numerous, varied responses to the racial harassment, he met the low threshold necessary to show that he was not deliberately indifferent to the racial harassment at the school.

455 F. App'x 612, 619–20 (6th Cir. 2012) (internal citations omitted). In almost all instances, Schimmel promptly and appropriately investigated and responded to incidents of racial harassment of which he was made aware. He commonly followed up with Garbade to keep her apprised of the discipline implemented. He also collaborated with Garbade and Smet to facilitate M.R.'s reporting. He never engaged in any behavior, or made any comment, indicative of racial animus.[32]

At best, Plaintiffs may have established negligence on Schimmel's part to the extent that he did not follow up on every instance of racial harassment and did not follow procedure for addressing complaints. But Plaintiffs have not established that Schimmel engaged in intentional discriminatory conduct.

**5. CONCLUSION**

For the reasons discussed herein, the Court will grant in part and deny in part Defendants' motion for summary judgment. To the extent that Plaintiffs' Title VI peer-to-peer/hostile environment claim relates to M.R.'s experience, that claim is dismissed. But to the extent that it relates to L.H.'s experience at BHS, the claim will proceed as to the specific instances enumerated. Plaintiffs' Title VI disparate treatment claim will proceed

---

[32]*See Brooks v. Skinner,* 139 F. Supp. 3d 869, 891–92 (S.D. Oh. 2015) (noting principal's "personal use of racial comments" as relevant in determination that a jury could find principal to have violated student's Fourteenth Amendment equal protection rights). M.R. testified that she thought Schimmel was racist and that he treated her differently because she was Black, but she stated that she based that opinion "not really" on "facts," but "just like a way [she] think[s] about it." She conceded that she was "simply guessing" that Schimmel treated her differently based on her race, and she could not remember "Schimmel ever making any comments to [her] about her race or skin color."

Case 2:21-cv-01284-JPS   Filed 05/17/23   Page 64 of 65   Document 148

solely with respect to Syens' handling of the toy airsoft gun incident, and Plaintiffs' Fourteenth Amendment claim against Schimmel is dismissed.

Accordingly,

**IT IS ORDERED** that Defendants' proposed renewed motion for summary judgment, ECF No. 122, be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Plaintiffs' Title VI peer-to-peer/hostile environment claim as to M.R. be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiffs' Fourteenth Amendment Equal Protection Clause claim against Defendant Scott Schimmel be and the same is hereby **DISMISSED with prejudice;**

**IT IS FURTHER ORDERED** that Scott Schimmel be and the same is hereby **DISMISSED** as a defendant from this action;

**IT IS FURTHER ORDERED** that Defendants' motion to restrict, ECF No. 126, be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that Plaintiffs' motion to seal, ECF No. 130, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion to seal, ECF No. 142, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiffs' motion to seal, ECF No. 145, be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 17th day of May, 2023.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge